5w  235
226  1482

## Scott *against* Seiler.

A sheriff may be permitted to amend his return, when made under a mistake of *fact*, if the application be made within a reasonable time: but after action brought against him for an escape, and issue joined, he will not be permitted so to amend his return to a *capias ad satisfaciendum* as to relieve himself from liability to the plaintiff: particularly when his reasons for making the amendment are predicated upon facts, which show, that at no time should he have been permitted to make the amendment.

The attorney at law of the plaintiff has full power to discharge a defendant from arrest upon a *capias ad satisfaciendum* issued by him, and the sheriff is bound to receive and obey his instructions.

In an action against a sheriff for an escape, the defendant in the writ of *capias ad satisfaciendum*, who it was alleged had escaped, is a competent witness.

If, in an action against a sheriff for an escape, he rely upon the fact, that the attorney of the plaintiff ordered defendant's discharge, it should be clearly proved; and if it appear that the order was given after the escape, it will not relieve the sheriff.

ERROR to the common pleas of *Dauphin* county.

This was an action of debt by Hugh Scott against Jacob Seiler, late sheriff of Dauphin county. The plaintiff, Scott, had obtained a judgment against Isaac M'Cord, upon which his attorney had issued a *capias ad satisfaciendum* which came to the hand of the present defendant, as sheriff, and upon which he returned *cepi corpus*. The plaintiff, having given in evidence the record of this judgment, and the proceedings upon it, gave the following evidence:

William M'Clure, Esq., sworn as a witness, testified as follows:

Sometime in September or October 1833, the defendant in this suit, and Isaac M'Cord, came to my office; it was in the evening; M'Cord came to me to see how he would get out of the arrest of Sheriff Seiler, who had him under arrest on a *capias ad satisfaciendum*, on the suit of Hugh Scott. I think it was under this *capias ad satisfaciendum* that has been shown. They talked of getting an insolvent bond, with Andrew Keefer as bail; think Seiler was filling the bond himself. M'Cord appeared extremely unwilling to make an application for the benefit of insolvent laws; I advised him to see Mr Rawn, who I understood from him was the attorney of the plaintiff, or to write to the plaintiff himself. Seiler was extremely anxious to get M'Cord to fix or arrange the matter—they left my office together, or about the same time.

Cross examined. M'Cord then lived, and now lives with his father-in-law, Peter Brua, in Harrisburg. He was often absent from town, leaving his family here. I was his counsel in the case of Scott *v.* M'Cord; think the sheriff went out of my office leaving Mr M'Cord there, before they both went away—it was after candlelight in the evening. . I think Mr Seiler filled the insolvent bond at my table—I do not remember that the bond was executed; I do not

know Hugh Scott; think I had no conversation with M'Cord after that; he was at large, he was in good health.

C. C. Rawn, Esq., affirmed. After the return day of this *capias ad satisfaciendum*, I came to Sheriff Seiler, and I spoke to him respecting the return on the back of the said writ, expressing my astonishment at it. He told me the return made on the writ was in pursuance of what Mr Wise told him, were the facts in relation to it. Seiler said he would go and see Mr Wise about it—he went out and returned and told me Wise was not in town, having gone to Millersburg, but that he would speak to him about it when he returned. John Wise was in the jail where the sheriff resided, and kept his office, and had been in the practice of executing writs for the sheriff repeatedly. On the 25th of September 1833, I issued this *fieri facias* with clause of *capias ad satisfaciendum*, as attorney for the plaintiff. I put it into the hands of John Wise, and charged him to be particular in executing said writ. This was after dinner, about four or five o'clock; about seven o'clock the same evening, John Wise came to my residence, nearly opposite to M'Cord's residence in this town, and told me at my door that he had arrested M'Cord on the writ I had given him and that he had just taken him up to the sheriff's office, and that he was then at the sheriff's office at the jail; I expressed my satisfaction that he had executed the writ. He then spoke of something else. The next morning I saw M'Cord on the pavement in Market street, near the corner of Third street, in this town, near Mr Krause's door—no one near him, except, I think, Mr Krause, who was at his own door—breadth of the pavement from him. This was on the morning of the 26th of September 1833; on that same morning about half past eight o'clock, John Wise came into the prothonotary's office, where I was sitting reading a newspaper. He said nothing to any one, but looked into the box, turned round and went out. I followed him and called him; he stopped on the pavement nearly opposite to Mr Wyeth's frame house; I asked him what M'Cord had done on the writ; he told me he had done nothing, but he believed he was going to file his bond that day; I asked him where M'Cord then was; he told me he was at home, at his own house, and had been there over the night. He also stated that M'Cord would get Andrew Keefer to go his bail in a bail bond. About fifteen minutes after that, M'Cord came into my office where I was sitting—he was unaccompanied by any person, and went away alone. I saw him after that almost every day through town, up to the return of the writ.

Defendant then offered to prove by Isaac M'Cord, that plaintiff's attorney, C. C. Rawn, stayed the *capias ad satisfaciendum*, by instructing witness, M'Cord, to tell the sheriff he had stayed it; objected to, as not going to maintain the issues, because plaintiff's attorney had no authority to stay the writ of *capias ad satisfaciendum*, and that it is not competent to prove stay in this way, also that M'Cord was interested to show his discharge.

[Scott v. Seiler.]

Objections overruled, and plaintiff excepted.

Isaac M'Cord, sworn.  Mr Rawn told me to go to the sheriff, and tell him that he, Mr Rawn, was going to write to Mr Scott, for time for me, and that he, the sheriff, should suspend any further operations on the writ till he would hear from Philadelphia. I then went to the sheriff, and told him that Mr Rawn had directed me to tell him to do nothing further, till he heard from Mr Scott.  Mr Rawn was the attorney of Scott, and the sheriff was Jacob Seiler. I asked Mr Rawn to write a note to the sheriff; he said he would not write, that I should tell the sheriff not to proceed any further, till he heard from Mr Scott; Mr Rawn mentioned that he was not on terms with the sheriff.  This conversation took place in Mr Rawn's office, in Harrisburg, about the latter end of September 1833.

Defendant then offered to prove, that on the evening the *capias ad satisfaciendum* issued, the witness was invited to go to the sheriff's office, that the sheriff wished to see him; that he went there without knowing what was wanted by the sheriff, or that the *capias ad satisfaciendum* mentioned, had been issued; that when there, the sheriff informed him of the *capias ad satisfaciendum* being issued; that the witness requested the sheriff to go with him to Mr M'Clure, his attorney, to see what he had better do in the case, and the sheriff agreed to accompany him, and did so, and aided him by filling up an insolvent bond.  That he was not arrested by the sheriff, and nothing like restraint or duresse was practised or shown to him by the sheriff; that he returned home from M'Clure's office, and that the conversation with Mr Rawn, already mentioned by the witness, took place the next morning following.

Objected that this goes to contradict the return of the sheriff, and to support this objection, the return of the sheriff was shown to the court.

Defendant then applied to the court for leave to amend his return, by striking therefrom the letters " C. C." which was granted, and the following minute made.

" January 31, 1835.  On motion of H. Alricks, Esq., the court grant leave to Jacob Seiler, late sheriff, to amend his return, by striking out the letters ' C. C.,' amendment made accordingly, *ex parte.*  This amendment allowed without prejudice to any person interested, in contradicting the sheriff's return.  To this amendment, Hugh Scott, by his counsel, objects and excepts."

This amendment was ordered upon the following deposition of Jacob Seiler:

" I, Jacob Seiler, do affirm, that the return made by me, as sheriff, to the *fieri facias*, with clause of *capias ad satisfaciendum*, No. 50, to November term 1833, of *cepi corpus*, was by mistake—that I had some conversation with Isaac M'Cord on the subject of the *capias ad satisfaciendum*, while in my hands, in which I requested his attention to it, but never had him in custody or arrest; that I accompanied him to Mr M'Clure's office with a view of having it ar-

ranged at the request of Isaac M'Cord, but that I offered no restraint to his person, and parted with him with the understanding that he was to have the insolvent bond which I filled up, signed regularly, and returned to me on the next day, or get a discharge from Mr Rawn, the plaintiff's attorney, and that this arrangement was made at the suggestion of Mr M'Clure, attorney for Mr M'Cord, and that the next morning I received the information from John Wise and Isaac M'Cord, that the writ was stayed by the plaintiff's attorney."

To this amendment plaintiff's counsel objects, as being made for the purpose of introducing evidence on this trial, which would not otherwise be given, and without proof of the truth of the amended return.

Objections overruled, and plaintiff excepted.

Isaac M'Cord. On the evening of the 25th of September 1833, John Wise called on me on my pavement, and told me the sheriff wished to see me; I went up to the jail to the sheriff; I went up one side of the street, and Wise went up the other side; Wise did not tell me on what business the sheriff wanted me; when we came into the sheriff's office in the jail, Wise threw a paper on the desk and walked off. Sheriff then said he had a process there, and that the only alternative I had was to pay the money, file a bond, or get time from Mr Rawn; he wanted me to go to Mr Rawn that night. I said I would rather see Mr M'Clure first, and I asked the sheriff to go with me and he did so. M'Clure explained the matter pretty much in the same way the sheriff did, and advised me to go to Mr Rawn. M'Clure got a bond and the sheriff filled it up; M'Clure then told me I should go to Mr Rawn, and if he would not suspend the matter, I must sign the bond with bail; I parted with the sheriff at Mr M'Clure's office that evening. The understanding was that I was to go to Mr Rawn; I did go to Mr Rawn's office that night, but he was not there; I went next morning and found Mr Rawn in his office. I was not out of town for four months after that; I got sick and was confined to my room; I had been sick before I went to the sheriff's office. It was about an hour after dark that Wise told me the sheriff wanted to see me; I was in the room where the sheriff does his business; the sheriff's office is the front room on the left hand of the entrance to the jail; do not think there was any disposition on the part of the sheriff to confine or arrest me in any way.

Cross examined. I do not think I stated before the arbitrators that I saw Mr Rawn that night that I saw Mr M'Clure; do not recollect what I stated before the arbitrators; I was very unwell; I called on the sheriff, on the jail steps, after I was with Mr Rawn, the morning of the 25th of September; was with Mr Rawn about nine o'clock that morning. That same morning I was with Mr Rawn, I saw the sheriff on the jail steps, and told him what Mr Rawn told me. I did dot know that Mr Rawn had seen Wise before I called that morning except from what the sheriff said; when I called on Mr Rawn I wanted him to write to Mr Scott to give me time; he said he would; I then asked him to write a note to the sheriff to

proceed no further, till an answer came from Scott; he said he and the sheriff were not on terms and he would not write to him. Mr Rawn then told me I should go to the sheriff and tell him he was going to write to Mr Scott for time for me to pay the money. Mr Rawn did not tell me he could not interfere between me and the sheriff; I requested Mr Rawn to write a note to the sheriff; but did not say he would not release me from custody without a note.

I said at M'Clure's office that Mr Rawn had prosecuted me, and I had little hopes of his doing any thing for me. The sheriff appeared very anxious at M'Clure's office that I should have the matter fixed. I always said I did not deny the debt and was willing to pay it when I got the money. I was at home that night after I was at the sheriff's office, and there was no sheriff's officer in my house. I have lived in Harrisburg about 20 years; I have lived 2 or 300 feet from the jail for several years; I remember distinctly that Mr Rawn told me to go to the sheriff and tell him to stop proceedings till he would hear from Scott, and I did tell the sheriff so. Hugh Scott lives at Manayunk, seven miles from Philadelphia, on the Schuylkill.

Mr. Rawn told me to tell the sheriff that he had agreed to write to Mr Scott, and he had power to let me go at large—that he should not trouble me till Mr Rawn had heard from Mr Scott. Mr Rawn said he would write to Scott for time, and sheriff should do nothing till he heard from Scott.

John Wise called.—Defendant offered to prove

" That Mr Rawn met the witness in the alley, at Hale's stable, and gave him the *capias ad satisfaciendum* in question—that the witness went to M'Cord and told him the sheriff wanted to see him —that he then went to the sheriff's office and gave the *capias ad satisfaciendum* to the sheriff, and left the office immediately. That next morning witness met Mr Rawn, and that Mr Rawn then told him he had stayed the writ against M'Cord: And further, that he (the witness,) never was the deputy sheriff, unless in a few instances, when he was specially deputed on the back of the writ."

Objected to, that it is not competent testimony under the plea of nil debet, and that this is not the proper way to make out the fact, and that attorney had not authority to stay the writ.

Objections overruled, and plaintiff excepted.

John Wise.—I met Mr Rawn in the alley by Hale's stable, in the afternoon. He gave me that *capias ad satisfaciendum* against M'Cord, and told me I must do this business myself, because he did not speak with the sheriff. This endorsement on the back of the writ "received the 25th September 1833," is my handwriting. On the afternoon of that day I received it. He told me to be particular and try and serve it that day—I said I would try; but would first go to the canal to serve a writ on two boatmen, as plaintiff had promised me five dollars if I got the money. I went down to Mr M'Cord in the evening. He was walking backward and forward by the porch at Mr Brua's house. I walked across from Walnut

street, and as I come over he came meeting me. I said—Mr M'Cord, Rawn has sued you, and I want you to come up to the sheriff's office. He asked me when he should come up. I told him immediately. I then went across Walnut street and went up as far as Gleim's, (now Hale's.) M'Cord went upon the opposite side, and crossed opposite the jail. I then went in and laid the writ on the desk. The sheriff was in. I went down to Mr Rawn's house on other business. Mr Rawn asked me if I had seen M'Cord. I told him I had, and he was up in the office with the sheriff. When I laid the writ down in the sheriff's office, I went out without saying a word. I think I did not show the writ to M'Cord. I saw Mr Rawn the next moning, in the alley that goes past the Prothonotary's office. He called me. I either asked him or he asked me what had become of M'Cord. I felt interested, as he told me to do the business myself. Mr Rawn said M'Cord had come to his office, and made such a poor mouth about his business in Philadelphia, and could not pay off, and that he (Rawn) had agreed to write to Philadelphia, and to stop proceedings until he should get an answer. I think the words were, that he should let it lay over. I went up and told the sheriff what Mr. Rawn said about letting it lie over. The sheriff said, be particular—what did Mr Rawn say? and I told him Mr Rawn had agreed to let it lay over till he heard from Philadelphia. I was not deputed by the sheriff in this case. I never had any authority from the sheriff to execute writs, except by special deputation on the writ. I was not deputed in the case of the boatmen. I carried bills round for costs, against those convicted of keeping tippling houses: got no money. I was turnkey in the jail. I copied some writs. I never received money for the sheriff, except in the case of the boatmen. I collected the money, &c., on a *testatum* from Lebanon, and made a mistake in the interest, and the sheriff was not pleased about it. I was paid by the month. John Stahl was deputy when I was in the jail. Kamerer done some business for the sheriff whilst I was there, but not much.

Cross examined. The sheriff was in the jail when I went up from talking with Mr Rawn on the 26th of September. About eight or nine o'clock that I had the conversation with Mr Rawn. He said he had seen M'Cord that morning. I went right up to the jail after talking with Mr Rawn. I think the sheriff did not go out of town that day at all. The sheriff made the return on the writ, as soon as I told him that Mr Rawn had agreed to let it lay over. When Mr Rawn told me I should execute the writ right away, he said, perhaps M'Cord might leave town.

For plaintiff,

C. C. Rawn, Esq.—I saw Wise about half past eight o'clock on the morning of the 26th of September, 1833, and at that time I had not seen M'Cord that morning. I did not speak with Wise that day again. About fifteen minutes after I talked with Wise, M'Cord came into my office, about nine o'clock. He spoke to me about this

[Scott v. Seiler.]

matter. He asked me to write to the sheriff and stay proceedings, on the writ. He said many things about his business in Philadelphia. I positively declined doing so. I said I had no authority to do it, and would not, unless my client gave me authority. Mr M'Cord asked me to write to Scott. I told him I would, and that I would state what M'Cord had stated to me, and would let M'Cord see the letter if he would come to the office. Whilst Wise and I were talking, the sheriff drove past in his sulkey, out Market street. I did not see the sheriff that day again. I neither told M'Cord or Wise, at any time, to carry any message from me to the sheriff, of any nature whatever. I told M'Cord positively, I would not interfere; that if the sheriff had taken upon himself to indulge him from the evening before, probably he would indulge him longer. I made notes or memoranda of all these matters as and at the time they occurred. On the 25th of November 1833, the sheriff said to me that his return was made in pursuance of what Wise had told him—that Wise had attended to the execution of the writ.

Sheriff's return of *cepi corpus* on *capias ad satisfaciendum*, No. 50, November term 1833, read in evidence.

Defendant offered amended return as follows:

"*Nulla bona* as to *fieri facias,* and stayed by plaintiff's attorney."

Objected to, that the sheriff cannot, on the trial of a cause, make evidence for himself, and that it goes to contradict his return.

Objections overruled, and plaintiff excepted.

*Rawn* and *M'Clure,* for plaintiff in error.
*Alricks* and *M'Cormick,* contra.

The opinion of the Court was delivered by

KENNEDY, J.—Though the errors assigned are numerous, they may all be resolved into three questions. First, did the court below err in permitting the defendant, who is sued here in debt, as the sheriff of Dauphin county, for having permitted Isaac M'Cord to escape from his custody, after being arrested upon a *capias ad satisfaciendum,* sued out of the court of the common pleas of the same county upon a judgment thereon obtained against M'Cord at the suit of the plaintiff in this action, for upwards of 300 dollars, including costs of suit, to amend his return? Second, had the attorney at law, who, as the attorney of the plaintiff, commenced the suit, prosecuted it to judgment, and sued out the *capias ad satisfaciendum* thereon, power or authority, in virtue of his being so employed by the plaintiff to collect his debt, to discharge the defendant in the judgment from arrest made under the execution, and from the custody of the sheriff, without the amount thereof being paid? And third, were Isaac M'Cord and John Wise, each, competent witnesses for the defendant?

In respect to the first question, it is certainly true that sheriffs,

v.—2 F

upon application made to the court within a reasonable time, have been permitted frequently to amend their returns to writs, where it has been shown clearly that they were made through mistake in regard to some matter of fact, which, from its nature, might not be within their own knowledge.  As, for instance, where there are other persons, beside the defendant in the writ, of the same name, residing within the bailiwick of the sheriff, and he arrests one of those other persons instead of the real defendant, and returns the arrest of the latter.  The court, in such case, upon application being made, as soon as the mistake is discovered and the fact ascertained, that the wrong person has been arrested, would doubtless permit the sheriff to correct his mistake, by amending his return to the writ.  And it is not perceived that such amendment could tend to prejudice the rights of any one; but, on the contrary, if not allowed, it is easy to conceive that it might be the cause of great injustice being done.  In the present case, however, it is proper to notice, in the first place, that the application by the defendant, as sheriff, for leave to amend his return, was not made for more than a year after his return; nor until after a suit was brought against him, founded upon it, that suit put to issue and upon trial before a jury.  After so great a lapse of time, and under such peculiar circumstances, it is difficult, perhaps impossible, to imagine any thing that would justify a court's interfering to relieve a sheriff from the legal effect of his return to the prejudice of the plaintiff's rights.  But here, so far from there having been any thing shown by the defendant, to warrant the interposition of the court, under the circumstances of the case, to allow him to alter his return, that it rather appears, even from his own affidavit, that he ought never to have been permitted to do so at any previous period.  According to his affidavit, which seems to have been made the basis of granting him leave to amend, it does not appear that the first return of the writ of *capias ad satisfaciendum,* was made by him through mistake or misapprehension of any fact whatever.  He, it would seem, knew all the facts and circumstances connected with his return, as well then as at the time he applied for leave to amend.  He admits by his affidavit that after he received the writ of *capias ad satisfaciendum* against Isaac M'Cord, and before the return day thereof came around, he saw M'Cord, *had him in his office, conversed with him in relation to the writ, requested his attention to it,* and *accompanied him from his own office to that of Mr M'Clure (M'Cord's attorney) for the purpose of having it arranged, by preparing an insolvent bond, which the defendant actually filled up, himself, for M'Cord,* and after delivering it to M'Cord that he might get it executed by sureties, *parted with him upon an understanding* that M'Cord was to have the insolvent bond executed and returned to him the next day, or get a *discharge* from Mr Rawn (the plaintiff's attorney in the *capias ad satisfaciendum.*) But because he (the defendant) did not actually *touch* the person of

M'Cord, or offer *forcibly* to restrain his person, or say to him, while in his company, "I arrest you," he is now given to understand (the correctness of which may be well questioned) that all that was done by him, did not amount to an arrest of M'Cord's person in law, and, therefore, he wishes the court to grant him leave to change his return to the writ, by striking out "C. C.," that is, "*cepi corpus*," and instead thereof, to return that before he executed the writ of *capias ad satisfaciendum*, the plaintiff's attorney directed him to stay it, or not to do so. From the defendant's own showing, by his affidavit, it is evident that there was no mistake, in any matter of fact, in regard to the arrest of M'Cord, and that if there was a mistake of any kind, it was, at most, only a mistake in law, as to what was thereby required in order to effect an arrest. But surely it was never before heard of, when it became the duty of the sheriff, under a writ in his hands, to make an arrest, and he had it fully in his power to do all that was requisite to accomplish it, and did do all that he believed necessary for that purpose; and, in short, considered that he had effected it completely, and accordingly made a return upon the writ to that effect, that the court could interpose and permit him to alter his return so as to release him from a liability that he would have incurred if he had done his duty. Yet this is nothing more nor less than the case before us. It was the bounden duty of the defendant when he had M'Cord in his office, to have arrested him. There was nothing to prevent his doing it in the most formal manner that can possibly be required by law; and that he thought he had done it, and had M'Cord in his custody, is plainly inferrible from what he says was the understanding between M'Cord and him, when they separated at M'Clure's office, to wit, that M'Cord was to get the insolvent bond executed, or otherwise procure a *discharge* from Mr Rawn, and to return with the one or the other the next day. Now, why get a discharge from Mr Rawn if he was not considered as in custody? An order merely to stay the execution of the writ until a further order to proceed therein, given to the defendant, would have been what ought to have been obtained, and all that was requisite, if M'Cord had not been considered as being under arrest by the defendant. But this, connected with the fact of his having thereupon made the return of "*cepi corpus*," proves conclusively that the defendant considered M'Cord as being in his custody under arrest. Then, under the most favourable aspect in which the conduct of the defendant can be viewed, according even to his own showing, what does it amount to? Certainly to nothing more nor less than this, that when it was his duty, to have made the arrest, and having it fully in his power to do so, he either neglected or refused to do it. Thus he asks to be relieved from the effect of a return made by him, which, if he had done his duty, he was bound to have made, by alleging his own wilful and culpable neglect of his duty. *Nemo, allegans suam turpitudinem, audiendus est.*

[Scott v. Seiler.]

This case may be illustrated further, by supposing a sheriff to have a *fieri facias* in his hands, directed to him against A. B. who has personal property at the time sufficient to satisfy the amount thereof, which is accessible to the sheriff, who calls upon A. B. and makes known to him the fact of his having the *fieri facias*. A. B. promises to pay it by the return of the writ; and the sheriff without seizing any personal property, or making a schedule of any, returns upon the *fieri facias*, " Goods seized to the value of the debt, damages, and costs herein mentioned. But A. B. fails to pay the amount of the execution to the sheriff at the return of the writ, and during the interim sells and parts with all his personal property; the sheriff after being called on by the plaintiff in the execution to pay the amount thereof, but failing to do so, is sued by the plaintiff for it; and upon the trial of the suit, he applies to the court for leave to amend his return, grounding his application upon his affidavit showing that he could have seized goods of A. B. sufficient to have satisfied the execution, but had neglected it, trusting to his promise that he would pay him the amount at the return of the writ. But A. B. not having done so, he, therefore, asks leave of the court to alter his return by striking it out and substituting " *nulla bona*" for it. It cannot, I think, be contended, that, in such case as the one put, the court could interfere so far with the plaintiff's rights as to grant leave to make the amendment asked for; yet, in principle, it is the very case under consideration. Sound policy and honesty both unite in requiring that the sheriff should be bound by his return in every such case. It is not made under any mistake in regard to a matter of fact, and as to the law, so far as it lays down and points out what his duty is in each case wherein he is required to act, he is bound to know it, and ignorance of it forms no excuse whatever for him. To permit him to alter his return, in such case, would, in effect, be depriving the plaintiff of the right which the law has secured to him. And it does not lie within the discretion of the court to do an act, which is calculated to defeat or to deprive a party of his right; so that when the amendment asked for is likely to have that effect, it cannot be granted.

In conformity to these principles I think it may be seen that in Rex *v.* Ward, *Bunb.* 323, where the sheriff made the same return to two different writs of extent against the same defendant, in short making himself liable twice for the value of the same property, the court refused him leave to amend his return. And in Ibbotson *v.* Tindal, 1 *Bing.* 150, *S.C.,* 8 *Eng. Com. L.* 281, the sheriff having returned to a *capias*, " I have taken the within named defendant, whose body remains in the prison of our lord the king under my custody," the court refused to permit him to amend his return, by striking out the return on the writ and returning according to the fact " that on the receipt of the writ by the sheriff, the defendant was in custody at the suit of other persons, and from

[Scott v. Seiler.]

thence until and at the return of the writ at the suit of other persons and the plaintiffs."

It is also a general rule that judicial proceedings shall not be amended, except there be something to amend by, lest instead of correcting an error by doing so, it should only be making one. And perhaps there is quite as much reason for applying this rule to the returns of a sheriff, as to things for the most part transacted in a court: For, like the record of a court, the return of a sheriff is of such high regard, that generally no averment shall be admitted against it: As if A. be returned to be outlawed, he cannot say, that he was only *quarto* or *quinto exactus.* *Kit. of Courts* 562, (*Ed. in English* 1675;) *Dalt. Sheriff* 189, *cap.* 42; *Com. Dig. Tit. Return* (6) 235 (*Rose Ed.*)

And again what could be more dangerous to the rights and interests of suitors, as well as to that of other persons, than to permit a sheriff to release himself from a responsibility created by his return, under the plea of correcting an error, by his making an affidavit contradicting the truth of his return? Might he not as well be permitted to set aside his recognizance in the same way? In principle, perhaps, there is but little difference between the two cases. It can seldom, if ever happen, that a sheriff will be so indifferent to his own interest as to make a return rendering himself liable beyond what he would and ought to be, if he were to perform his duty vigilantly and faithfully; or if he ever does, it is upon the faith of some promise or assurance made by the party against whom he has the process : and if deceived or disappointed by him, it forms no apology for his neglect of duty: and still less a ground upon which to ask relief from the liability to which he has subjected himself by his return.

But further, even upon the common principles of evidence, having made a return by which he admits his liability to the plaintiff, counter declarations by him, though made upon oath, cannot be received in evidence to disprove the truth of such admission of liability. Such is the nature of man, and so mindful is he of his own interest at all times, that it has never been considered that he could make such admission unless it were true. And upon this ground, it is received as evidence against him of the very best and highest nature : and is therefore admissible to establish a charge against him that may affect his life as well as his property. But when he has deliberately put his admission upon record as in the case of a return made to the court upon a writ, is it not reasonable that it should still be entitled to greater credit, if possible, and be held to be conclusive upon him? And would it not be directly contrary to every principle of analogy, as regards the rules of evidence, even where this admission is by parol, to have it set aside by his own subsequent counter declaration, though made on oath, that it was not true? For having become interested, he cannot be admitted, according to the established rules of evidence, to testify thus in

his own favour.   He is not considered as entitled to any credit in such case; the temptation to deviate from the truth is too strong for him to be trusted.   In every view, then, that can be taken of the question, whether upon authority, principles of reason or policy, it is perfectly right that the defendant in this case should not only be bound, but conclusively so, by the official stamp, which he first gave to his return on the *capias ad satisfaciendum.*   And in the language of the late Chief Justice Parker, "it is better for the public and for the officers themselves, that they should be dealt with strictly, for mistakes will increase with the indulgence that is used towards them."   Emerson *v.* Upton, 9 *Pick.* 170.

We, therefore, think the court below erred in permitting the defendant to amend his return first made on the *capias ad satisfaciendum*; and afterwards in admitting evidence to disprove the fact of his having arrested the body of Isaac M'Cord by virtue of it.

As to the second question, we think that the attorney of the plaintiff in the *capias ad satisfaciendum* had full power and authority to discharge the defendant therein from the arrest under it, without having received, or the amount of money thereon endorsed being paid. This authority has been exercised by attorneys throughout the state from time immemorial almost; and especially where the plaintiff, as in this case, resided out of the county in which the judgment was obtained, and the defendant therein named resided, at the distance of nearly one hundred miles; and did not, from any thing that was shown on the trial, appear to have attended at all in person to the prosecution of his suit, and the execution of the judgment therein obtained, for the purpose of looking after the collection of his debt.   It seems to have been entrusted, as is usual in such cases, entirely to the discretion and management of Mr Rawn, his attorney, with full power, implied at least if not expressed, to do whatever he, under the circumstances, for the time being, might think best, in order to secure the payment of the debt as speedily as possible.   The attorney employed to collect the debt in such cases does not act merely in the character of what may be considered strictly an attorney at law, or of the court in which the action is brought, but also in the character of an agent of the plaintiff or the creditor, invested with implied power, at least, to deal with the defendant, especially if his circumstances be considered doubtful, and to direct the sheriff to execute process, sued out against him or not, just as he shall think the one course or the other the most likely to secure the payment of the debt ultimately; and, as regards the sheriff, he is bound to receive and to obey the instructions of the attorney, the same as he would those of the plaintiff himself were he present giving them.   The attorney represents the plaintiff as well after the body of the defendant is taken in execution, as before in obtaining the judgment; and may release the debtor from his confinement either upon or without payment of the debt.   For his trouble and agency in such cases he is entitled to receive a reasonable compensation.   Gray *v.* Brackenridge, 2 *Penns.*

*Rep.* 75; Foster *v.* Jack, 4 *Watts* 334. But, as attorney at law strictly, his fees may be said to be fixed by statute. That he is invested, however, with powers beyond those which appertain to him in·his character as attorney at law is fully recognised and laid down in Lynch *v.* Wolverton, 16 *Serg. & Rawle* 368, as well as in the cases cited above.

But whether any order of discharge from the arrest was given by the attorney for the plaintiff to the sheriff, while the defendant named in the *capias ad satisfaciendum* was in custody after the arrest, is a fact that ought to be distinctly proved to the conviction of the jury; for the allegation of the defendant here, that it was so, is not to be regarded, and amounts to nothing. Indeed, any evidence that was given on the trial of the cause, tending to show that the attorney for the plaintiff had given any direction to the sheriff, other than that of executing the writ immediately, would rather seem to have been on the day after the defendant in the *capias ad satisfaciendum* most likely had been arrested, and suffered by the sheriff to go again at large. If this be so, then the defendant here permitted the defendant in the *capias ad satisfaciendum* to escape and to go at large without any direction from the plaintiff's attorney authorising it; and he would therefore be liable in this action to the plaintiff, for the whole amount of the judgment, whereupon the *capias ad satisfaciendum* was sued out; and the subsequent assent of the plaintiff's attorney, even if it were given, to the escape of the defendant in the *capias ad satisfaciendum* afterwards, and to his being and remaining at large, would not release the defendant here from his liability to the plaintiff in this action.

Then, as regards the third question, were M'Cord and Wise competent witnesses for the defendant? We can see no substantial objection to their competency. They do not appear to have been interested in the event of this suit. Even if there should be a recovery here against the defendant, M'Cord would be subjected to no more liability by it; nor would he have to pay a cent more on account of it. And, as to Wise, there does not seem to be any colour for saying that he is interested, or that his rights or liability will be affected in any way by a recovery here. But so far as the evidence given by either of them tended to show that there was no arrest of M'Cord under the *capias ad satisfaciendum*, it was clearly incompetent, because it went to contradict the sheriff's return thereon as originally made, and was therefore inadmissible; and, likewise, so far as it went to prove that the order, which they speak of being given by the plaintiff's attorney to the sheriff, to stay further proceedings in the writ of *capias ad satisfaciendum* was given after the defendant therein had been arrested and permitted to go at large by the defendant here, it was irrelevant, and therefore ought not to have been admitted.

The judgment is reversed, and a *venire de novo* awarded.